## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

WESLEY E. P.,[1]

                Plaintiff,

v.                                  ACTION NO. 2:21cv585

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Wesley E. P. ("plaintiff") filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). He asserts the Administrative Law Judge ("ALJ") violated 20 C.F.R. § 404.1520c by failing to properly evaluate the supportability and consistency of certain medical opinion evidence.

An order of reference assigned this matter to the undersigned. ECF No. 11. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED,** and the Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED.**

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.     PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on August 18, 2020, alleging he became disabled on May 16, 2019,[2] with a date last insured of June 30, 2020. R. 15, 18, 41, 181–83.[3] Plaintiff's alleged disability arises out of lumbar spine strain, radiating radiculopathy, degenerative disc disease, intense chest pain, obstructive sleep apnea, hypertension, shoulder pain, acid reflux, major depressive disorder, and general anxiety. R. 194.

Following the state agency's denial of his claim, both initially and upon reconsideration, plaintiff requested a hearing before an ALJ. R. 71–80, 83–95, 121–22. ALJ Craig R. Peterson held an in-person hearing on June 29, 2021, and issued a decision denying benefits on July 20, 2021. R. 15–32, 37–70. The Appeals Council denied plaintiff's request for review of the ALJ's decision on August 27, 2021. R. 1–5. Therefore, ALJ Peterson's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint in this Court on October 25, 2021. ECF No. 1. The Commissioner answered on January 27, 2022. ECF No. 9. In response to the Court's order, ECF No. 12, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on March 2 and March 30, 2022, respectively. ECF Nos. 13–14, 16–17. Plaintiff filed a reply on April 13, 2022. ECF No. 18. As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Although plaintiff initially alleged an onset date of October 15, 2017, the ALJ granted his attorney's oral motion to amend the onset date to May 16, 2019. R. 15, 41, 71, 83–84.

[3] Page citations are to the administrative record the Commissioner previously filed with the Court.

## II.   RELEVANT FACTUAL BACKGROUND

Plaintiff presents one issue on appeal, arguing that the ALJ failed to properly evaluate opinion evidence of physician's assistant ("PA") Corinne Rathnam, when he failed to consider the supportability and consistency of her opinions. Because PA Rathnam's opinions only address exertional limitations based on plaintiff's physical conditions, *see* R. 438–63, the Court focuses its summary of the record on these conditions, and limits its discussion of plaintiff's mental health and other, less related issues.

### A.   *Background Information and Hearing Testimony by Plaintiff*

At a hearing before the ALJ on June 29, 2021, and in a disability report completed on August 29, 2020, plaintiff provided the following information. At the time of the hearing, plaintiff was 41-years old and was receiving VA benefits for a 90 percent service-connected disability rating[4] stemming from his service as a medic in the U.S. Army National Guard, which ended in 2009. R. 42–47; *see also* 831 (VA notes indicating plaintiff was discharged due to unspecified injuries). After his service ended, plaintiff worked with the Pentagon Force Protection Agency for 1.5 years until February 2010, before working for six months in February 2011 with a private company. R. 48–49, 196. In 2012, plaintiff was a student on the GI Bill. R. 50. For approximately seven months in 2013, plaintiff worked as a delivery driver. R. 196, 200. Plaintiff last worked as a private military contractor instructor from October 2014 to October 2017, when he stopped

---

[4] Specifically, as of June 2021, plaintiff was 50 percent disabled due to major depressive disorder, 20 percent due to hypertension, 10 percent due to right shoulder tendonitis, 20 percent each due to radiculopathy of the left upper and left lower extremities, with the "left lower extremity (sciatic nerve) associated with lumbar spine strain with syrinx formation of the thoracic spine," 10 percent due to gastroesophageal reflux disease, and 10 percent due to degenerative disc and discogenic disease of the cervical spine. R. 263. This largely aligns with a similar 90 percent disabled rating from September 2019 in which several of plaintiff's conditions were described differently and which included 10 percent disability ratings for eczema and a hiatal hernia. R. 432.

3

working to his medical conditions. R. 49–51, 194, 196, 200. The ALJ found that all these jobs, except the delivery driver role, were performed at the heavy exertion level. R. 51.

Plaintiff testified that his neck had troubled him since 2008 during his time in the military, and that he had most recently had surgery on his neck or cervical spine in 2016 for a second revision fusion. R. 52. He testified to receiving treatments he described as "throwing the kitchen sink at it" to address his chronic neck and back pain, including acupuncture, chiropractic, medications, ultrasound, and other treatments. R. 52–53. Plaintiff's lumbar problem was "not as major a critical issue as the mid-back and the neck and the shoulders," although it also hurt. R. 53. Plaintiff also described having issues with sleep apnea, carpal tunnel syndrome, daily severe headaches, high blood pressure, major depressive disorder, and generalized anxiety disorder. R. 53–56, 61–62.

Plaintiff testified that his conditions limited him to lifting 10 pounds, and that pain with stooping or torsion prevented him from lifting more. R. 56–57. He also testified to changing positions frequently to prevent his muscles from tightening up and causing discomfort, pain, and nausea. R. 57. He also had right leg pain and weakness, which limited his ability to walk, but he stated that he could do inside chores like cooking, cleaning, and laundry so long as they were "[s]elf-paced." R. 57. For example, plaintiff said he would not cook on a day he had a VA appointment, and would only go to the grocery store at hours when others were not there, although sometimes his pain or anxiety prevented this. R. 62. Plaintiff also took various medicines for anxiety, insomnia, muscle spasms, pain, acid reflux, and pain-induced nausea. R. 197, 260–61.

Plaintiff tried to find work between May 2019 and June 2020, although he stopped because he "just couldn't do it." R. 59. Specifically, he was concerned with "pain flares" or a "pain crisis," which could "last days or a week" and could keep him from coming in to work for "even a month."

4

R. 63. Nevertheless, he graduated from a psychology master's program in 2020. R. 44–45. This program required that he complete 1,000 hours of volunteer work, which plaintiff did through unpaid internships. R. 59–60. After being removed from his first internship due to "physical issues," he completed a second internship involving riding along with police, despite having "massive issues during that time with doing that work." *Id.*[5]

**B.   *Function Reports and Statements of Non-Expert Witnesses***

In a September 30, 2020 disability report, plaintiff reported that his conditions, particularly his severe head, eye, back, shoulder, and muscle pain, along with anxiety and panic attacks, limited his ability to do daily life activities. R. 213. For example, plaintiff was limited in doing daily chores, interacting socially, enjoying hobbies, and dealing with occupational challenges, including bending, twisting, pulling, pushing, and staying in one position longer than 30 minutes. R. 213, 217. Plaintiff also reported these conditions limit his ability to squat, bend, stand, reach, sit, kneel, and climb stairs, as well as his ability to lift more than 20 pounds, walk more than 0.5 miles before needing to stop and rest, and concentrate for more than 40 minutes. R. 218. Plaintiff reported taking more than two hours to "get going" in the morning, needing to lie down at lunch to ease the pain, and spending between four and six hours a day on self-care. R. 214, 220. He also reported trouble sleeping due to "constant waking from pain" and sleep apnea. R. 214. While plaintiff can cook, it reportedly takes him two to three hours, and it, along with mowing, doing dishes, cleaning, and laundry, can be painful. R. 215. Plaintiff also cannot drive more than 30 minutes due to pain and blood pressure issues, and needs lidocaine patches/cream so that he can move. R. 216, 219.

---

[5] Notes from an evaluation by a clinical psychologist suggest that plaintiff was removed from his first internship due to his "inability to be routine and not let [his] injuries affect [his] ability to provide mental health treatment." R. 436. These notes explain that plaintiff found the first internship's office environment "too taxing." *Id.* Nevertheless, plaintiff apparently completed the internship with the police, despite it involving 12-hour shifts riding in cars. R. 60, 436.

While plaintiff reported that he can handle "big stress," daily stress and drama can be "infuriating," and changes in routine can be "difficult." R. 219.

Plaintiff's then-wife[6] submitted an October 2020 disability report with mostly the same information as plaintiff's function report, although it focuses more on plaintiff's pain. The report states plaintiff is a "shell of the man [she] married" in "excruciating pain everyday" who "spends his entire day trying to make the pain go away so that he can fall asleep at night," such that "the only way he can get through the day is to sit on a heating pad, hook up to a [transcutaneous electrical nerve stimulation ("TENS")] machine and try to relax." R. 221–22, 228. Thus, plaintiff is limited in his doing chores, hobbies, physical activities, getting around, and engaging in personal care, and "if he does do anything he is incapacitated for days." R. 222–28.

Plaintiff's wife also wrote a letter dated April 23, 2019, reporting many of the same issues. R. 271–72. However, the letter adds that plaintiff suffers daily from post-traumatic stress disorder ("PTSD"), that he is hypervigilant, constantly in fear of dying, very easily angered for no reason, morose, and suicidal. R. 271. She also reported "[a]lmost every muscle in his thoracic area is in flexion." *Id.* She further wrote that plaintiff cannot go out for more than a few hours, and that trips outside require two hours of mental and physical preparation. *Id.* Finally, she noted that plaintiff was removed from an internship due to "his fear of mortality." *Id.*

Plaintiff also submitted a letter written by a classmate on March 26, 2019, in which she attests to personally witnessing plaintiff's physical and mental decline in the prior year during classes and his internship. R. 269. She also noted plaintiff's "high levels of depression and anxiety," his frequent apparent pain while sitting for long periods of time, his back pain, and his withdrawal from his classmates. *Id.*

---

[6] Plaintiff and his wife divorced in January 2021. R. 42–43.

Finally, plaintiff submitted a letter written to the VA by his last employer, for whom he worked as a private military contractor instructor, who notes that plaintiff's "health rapidly deteriorate[d]." R. 275. The letter also claims that plaintiff was prescribed very powerful pain killers, but that he could not work through the pain to meet the physical requirements of his job, so he resigned to focus on his health. R. 274–75.

## C.   *Hearing Testimony by Vocational Expert*

Florence Clemmons, a vocational expert ("VE"), testified at the hearing. R. 65–69. Based on the ALJ's hypotheticals, VE Clemmons opined that someone with plaintiff's age, education, work history, and the residual functional capacity ("RFC") could perform certain unskilled, sedentary jobs in the national economy, such as sorter, table worker, and inspector. R. 66–67. VE Clemmons also testified that someone who needed to miss "up to three or more days on a consistent and sustained basis" would be precluded from performing any work in the national economy. R. 67. She further testified that unskilled workers could not miss more than 10 days in an average year, and not more than 2 days in any given month. *Id.* Finally, she testified that a worker being off-task 15 to 20 percent of the day 1 to 2 days a week, or being unable to interact with coworkers or the public at all, precluded competitive employment. R. 68–69.

## D.   *Relevant Treatment and Examinations*

### 1.   Charleston VA Medical Center/Savannah Outpatient Clinic Charleston

Plaintiff's records from this facility begin in October 2016, with plaintiff having chest pains and a left heart catheterization and coronary angiography, which showed mild luminal irregularities. R. 356–62, 340–41. The chest pains were determined to be caused by non-obstructive coronary artery disease and were treated with daily aspirin and "[a]ggressive risk factor reduction." R. 356.

7

In February 2017, there was a request for a pharmacological consult concerning placing plaintiff on oxycontin, but this was denied due to "preferred alternative therapeutic option(s) hav[ing] not been exhausted." R. 342–43.

In November 2017, plaintiff sought treatment for symptomatic arrhythmia and palpitations. R. 338–39.  He was given an event monitor to wear for at least two weeks and referred for cardiology testing. R. 341.  The results of the heart monitor were later noted to be "unremarkable." R. 310.

Aside from a dermatological biopsy, plaintiff next sought treatment at this facility in October 2018 for an EMG report which showed median nerve compression at the left and right wrists. R. 335, 354.  In February, March, July, and November 2019, plaintiff received additional anti-inflammatory trigger point injections. R. 349–54.

In May 2019, plaintiff received a neuropsychology evaluation, which largely did not touch upon plaintiff's physical conditions with two exceptions. R. 325–34.  First, the evaluation noted plaintiff's head injuries, "the symptoms of which have been reliably demonstrated to fully resolve within several months of injury," were considered highly unlikely to have "directly caused any current cognitive sequelae," although evaluation for a possible migraine was recommended.  R. 332–33.  Second, the report noted plaintiff's history of chronic pain and its effects on his mental health, including his reports of constant, radiating pain and his resulting feeling that "everything in me is dead and rotting."  R. 327, 329.  Plaintiff also reported that his needs for self-care consumed "6–7 hours of his day."  R. 328.  Plaintiff was recommended to join a "residential pain/rehabilitation program." R. 333.

In August 2019, plaintiff had another pain consultation in which he raised concerns with using opioids given his internship with the police. R. 319–23.  Plaintiff was noted as getting relief

8

for his upper spine with Botox, feeling a burning sensation in his right leg, and having "issues [with] his atlas [(the first cervical vertebra)] that can't be handled [with] conventional chiro" and for which he wanted to try Botox. R. 319.  Plaintiff's doctors considered the Botox request and recommended another MRI of the cervical spine "to check for tonsillar herniation in view of arm and leg symptoms." R. 323.

In October 2019, plaintiff's anesthesiologist reviewed plaintiff's chiropractic treatment, which noted plaintiff had a thoracic spine spasm. R. 318.  In November 2019, plaintiff reported "struggling" and having "severe pain in his upper traps, with numbness in his right thigh and weakness, and left arm numbness at times." R. 311.

In January 2020, a cardiology consultation for plaintiff's chronic palpitations recommended an echocardiogram to rule out a structural heart abnormality. R. 310.  One month later, a nephrology consultation was requested for plaintiff's alkaline urine, which had a pH of 8. R. 309–10.  Although noting that this condition was likely non-pathologic, no clear cause was found, and the incident "once again raise[d] concern for problematic substance use and problematic opioid related behavior." *Id.*

In May 2019, October 2019, and March 2020, plaintiff had successful bilateral "CT guided selective facet radiofrequency ablation/rhizotomy facet" ablations of his thoracic and/or cervical joints, along with auricular acupuncture. R. 376–82, 388–99, 402–13.  Plaintiff also had successful trigger point injections of the right and left shoulder girdles in May 2019 and March 2020.  R. 376–77, 405, 408, 413.

In September 2019, an MRI of plaintiff's cervical spine showed "[e]vidence of prior C5-6 anterior and posterior fusion" along with a "C4-5 disc osteophyte protrusion with mild canal stenosis," although signal changes within the spinal cord were normal. R. 399–402.  A December

2019 imaging study also revealed an "[u]nremarkable right shoulder appearance" with normal or unremarkable findings and no significant changes from a prior study in 2012.  R. 387–88. However, an MRI taken later that month of the left shoulder showed "[m]ild rotator cuff tendinosis without tear," along with "[m]inimal degenerative changes at the greater and lesser tuberosities and the acromioclavicular joint."  R. 385–87.  A concurrent MRI of the right shoulder showed "[m]ild supraspinatus and infraspinatus tendinosis without tear."  R. 382–85.  Additionally, plaintiff had an echocardiogram in January 2020, with no results reported, R. 348–49, a stable chest x-ray which showed no evidence of acute pulmonary disease and only "[m]inimal mid thoracic degenerative disc disease" in March 2020, R. 375, and, possibly, an MRI of his cervical and thoracic spine in September 2020, without reported results, R. 428.

Records from this facility otherwise indicate that plaintiff had the following relevant active medical conditions:  arthropathy of the cervical spine facet joint, chronic back pain, thoracic back pain, chronic pain syndrome, neck pain, "pain associated with both [p]sychological [f]actors and a [g]eneral [m]edical c[ondition]," fibromyalgia, and cervical spondylolysis without myelopathy. R. 280–82.

### 2. Goose Creek Clinic

In February 2017, plaintiff visited this facility for a pain consultation and to have a TENS unit replaced.  R. 343–45.  Plaintiff reported chronic chest wall pain despite "several negative cardiac work ups recently" and that he "can't take a deep breath unless he takes a[n] oxycodone," although he could ambulate without an assistive device.  R. 343–44.  Plaintiff was noted as having a history of failed surgery for his chronic neck and mid-back pain along with chronic muscle spasms in his lats and rhomboids associated with T6-9 compression factures.  R. 343.  His medication was reviewed, and plaintiff was recommended to try massage therapy, acupuncture,

and increased physical activity, including Tai Chi and pool exercises, to treat his back problems. R. 344–45.

### 3.   Tampa, Florida VA Medical Center

In June 2020, plaintiff was admitted to a five-week virtual pain rehabilitation program at this facility for his "persistent pain in his upper and mid back which radiates into his chest and upper extremities." R. 304–08. The program included once weekly individual sessions, twice weekly group education classes, and Tai-Chi and yoga sessions. R. 308.

At intake, plaintiff's two past cervical spine surgeries, a syrinx (a fluid-filled cyst) in his thoracic spine, a disc bulge, and a compression fracture in the thoracic spine area were noted. R. 305. Plaintiff's pain was rated on a scale about its effects on his daily activity as "[h]ard to ignore, avoid usual activities," and his activities of daily living were all scored as independent or modified independent, although plaintiff was noted as having difficulty with lower body activities, including donning and doffing shoes and socks. R. 306–08. Plaintiff reported being able to perform most home activities "including cleaning, cooking, laundry and grocery shopping," although his stepson took care of the yard. R. 307–08. Plaintiff also reported "good strength" in his upper extremities for short bursts, although he had low endurance and tolerance. R. 307. Additionally, plaintiff reported he had a good grip bilaterally and was noted as having intact gross and fine motor control, although he reported a "burning sensation in hands, numbness in bilateral hands caused after prolong[ed] use of hands." R. 307. Plaintiff's pain was noted as being aggravated by activity and alleviated by massage and chiropractic measures, along with lying down on his back. R. 305.

The last record for this facility dates to June 30, 2020, when plaintiff was participating appropriately in the program. R. 294–300. Therefore, no records are available for later sessions, or any exit evaluation.

11

4.    **Ralph H. Johnson VA Medical Center**

The records received from this facility cover the period of July 1, 2020, to February 22, 2021.[7]

Plaintiff sought treatment in mid-July 2020 due to, among other things, increased difficulty breathing, increased lower back/flank pain, extreme fatigue, and dizziness. R. 827–28. Plaintiff was sent to an emergency room, given a prescription for promethazine, and advised to consult a neurologist. R. 820, 825–26. Plaintiff was negative for COVID. R. 819. That month, plaintiff also had a successful cervical facet ablation to his C4/5, C5/6, C6/7, and C7/T1 facets, which was described as a "spinal - facet nerve block." R. 684–92, 817–18. Other July notes also indicate unchanged upper limb and neck pain symptoms and reference an MRI of plaintiff's lower back showing "minimal changes present" and "some mid thoracic disc budging." R. 836.

In August 2020, plaintiff reported "having intense pain in [his] upper back/shoulder/ribs, [and that] it hurts to breathe," along with nausea and vomiting and "burning/sharp pain" in his head. R. 802. Nurse's notes the next day indicate plaintiff reported that his chiropractor told him that "his ribs move a lot and 'go out' frequently and must be set back into place with every visit." R. 800. Further, this chiropractor reportedly "suggested that pain may be [the] result of thoracic outlet syndrome or shoulder problems that have never been diagnosed." *Id.* Plaintiff added that facet ablations provided minimal relief, and that his pain was not psychological. R. 800–01.

That same month, a doctor suggested plaintiff may have fibromyalgia because most of plaintiff's MRI "findings are described as mild but [his] pain is greater than what would be

---

[7] Pre-dating the evidentiary records, an April 17, 2020 letter from Dr. Williams, a VA doctor at this facility, reports that plaintiff suffers from "severe, intermittent, disabling pain." R. 845. Dr. Williams states he witnessed two such episodes in the last 1.5 years, and that they hurt plaintiff's mental and physical health. *Id.* He opined that these "pain crises" occurred "seemingly at random," making it impossible to predict when they would incapacitate plaintiff. *Id.*

expected," and recommended plaintiff treat this with acupuncture, massage, exercise, and dietary changes. R. 797. Plaintiff replied that fibromyalgia had been previously discussed, although he also expressed worries that his doctors had either missed something or that something was worsening. R. 794. Plaintiff also reported that his hamstrings were highly sensitive, that his scalene was tight and tender, as were his deltoids, and that he had "[v]ery tight traps, rhomboids, teres major, subscap, latts, [and] erector" muscles. R. 794–95. According to plaintiff, these conditions caused him to feel like his ribs were broken, but that the pain felt worse than when he had actually broken his ribs two years earlier. R. 795. Plaintiff sought further testing and stated he wanted "normalcy without medications." *Id.* Despite the doctor's recommendation, however, notes from early September indicate that plaintiff was "not exercising much because it worsens his pain and blood pressure goes up," although plaintiff was not in any acute distress. R. 788, 792.

By mid-September 2020, plaintiff's primary care physician's assessment of plaintiff's conditions went from suspecting to diagnosing fibromyalgia, along with chronic pain, essential hypertension, chronic bilateral shoulder pain with mild tendinosis, and thoracic symptomatic syrinx. R. 783, 793. However, plaintiff also reported that his pain was better controlled with a new medication (duloxetine), and his energy was better with less shoulder tension. R. 777. Plaintiff requested, and received, a doubling of the dose of duloxetine. R. 777, 783. A follow-up appointment and later emails sent in October indicate that duloxetine helped, although plaintiff still suffered from radiating deep thoracic spinal pain, with some pain in his shoulder and upper back muscles. R. 754, 759. Plaintiff's doctor recommended he try battlefield acupuncture, a type of auricular acupuncture, which reportedly reduced his pain "tremendously while the darts [were] in." R. 753–55.

In late October 2020, plaintiff reported that his daily step counter showed him walking 2.5

13

to 6 miles per day, due to his work preparing to sell his house and to move to Virginia. R. 752. Plaintiff planned to try "small walks again" once things settled down, although he noted some concerns with his heart rate and blood pressure. *Id.* Plaintiff's doctor said that his heart was healthy enough for exercise, although there were some concerns about his heart rate. R. 750–52. However, by mid-November, plaintiff was experiencing trouble breathing and an "escalating pain crisis," with the left mid-part of his back being "extremely tight." R. 744. Plaintiff's primary care physician prescribed tramadol, although it resulted in elevated blood pressure, and other negative symptoms. R. 743–45.

In November 2020, MRIs were taken of plaintiff's thoracic and cervical spine, R. 680–84, which, as noted below, were reviewed by doctors at Hunter Holmes McGuire VA Medical Center. *See* R. 640–41. In December 2020, plaintiff's doctor diagnosed him with thoracic degenerative disc disease, and opined that plaintiff's "pain limits his ability to work." R. 737–38.

This facility's records otherwise indicate that plaintiff was diagnosed with the following relevant medical conditions: compression fracture, single-level cervical spondylosis without myelopathy, pain disorder "associated with both [p]sychological [f]actors and a [g]eneral [m]edical c[ondition]," joint pain in ankle and foot, low back pain, thoracic back pain, neck pain, arthropathy of cervical spine facet joint, cervical radiculopathy, post-traumatic syrinx, and fibromyalgia. R. 648, 652–64. Plaintiff was prescribed various medicines to reduce pain, nausea, blood pressure, and cholesterol, for muscle relaxation, and to aid with sleep. R. 665–75.

**5.  Hunter Holmes McGuire VA Medical Center**

After moving from Georgia to Virginia, plaintiff was treated at this facility between December 8, 2020, and March 31, 2021. R. 505–07, 637–46. During his first primary care appointment in January 2020, plaintiff reported that his main concern was his history of chronic

14

pain, and that his previous pain doctor accused him of having a substance use disorder. R. 637; *see* R. 627 (reporting that his previous doctor "cut [him] off as a patient" after accusing him of being a substance abuser). Plaintiff also reported a daily pain of 7–8 out of 10, that he felt like he had broken ribs with every breath stinging or hurting, as well as chronic thoracic pain and intercoastal/sternum pain and chronic shoulder pain that felt like a "boa constrictor is wrapping around [him]." R. 637. Plaintiff's treatments of massage, chiropractic care, acupuncture, Epsom salt baths, a TENS unit, nerve ablations, Botox injections, Toradol, steroid/lidocaine injections, and a butrans patch were all also noted. *Id.* Additionally, the impressions from the November 2020 MRIs of plaintiff's cervical and thoracic spine were reviewed, which revealed only "very slight" and "mild" abnormalities of C7 and "very small" and "mild" abnormalities of C6-C7 along with mild bulging of T6-T9 "without evidence of significant narrowing" and "[i]increased localized marrow edema signal at T6-T7 . . . which is degenerative/Modic type in nature and may be associated with pain." R. 640–41. The MRIs showed "[n]o [lower extremity] edema." R. 640. Plaintiff was referred to a pain clinic and told to follow up in one month, R. 641, which he did, although this was largely to address mental health issues, R. 584–92.

In February 2021, plaintiff sought treatment for certain gastroenterology issues, a COVID-19 screening, had a psychiatric consultation for his mental health relating to his physical pain, and a heart event monitor placement. R. 607–10, 615–25. The two-week heart monitor study was completed in March 2021 and "indicate[d] non-arrhythmic symptoms," with one incident of ventricular tachycardia for four beats. R. 483–94. Despite this, the results were described by one doctor as "normal." R. 515.

Plaintiff also had a pain management consultation in February 2021, in which he stated that butrans patches were the only thing that helped, although he stated he had no difficulty falling

or staying asleep. R. 600. A physical examination showed plaintiff had full motor functions in his shoulder, elbow flexors, elbow extensors, and wrist extensors, along with a non-antalgic gait and normal muscle tone and bulk, normal range of motion, and a normal sensory function. R. 602–03. Plaintiff's doctor noted that he did not appear to display pain behavior signs, but also did not display drug-seeking behavior. R. 603. That doctor characterized plaintiff's treatment as including "extensive conservative and interventional therapies." R. 606. She also noted that "[g]iven his history and no real source found for pain butrans patch (or narcotics in general would not be good choices fo[r] this patient)" and noted that "butrans is an unusual medication to be the only narcotic used." R. 607.

Later that month, a rheumatologist noted plaintiff's ongoing pain complaints, including that his back feels "like a sprained ankle," severe chest pain, a burning pain on the right side that stopped at the knee, and that "sunlight exacerbates his pain and symptoms." R. 566–76. The rheumatologist conducted a physical examination and noted mostly normal results, including complete range of motion in the upper extremities, knee, and ankles, and no internal or external torsion in the hips. R. 571. The rheumatologist's examination and assessment found plaintiff had widespread pain and "a great deal of symptoms" for fibromyalgia, including severe fatigue and moderate cognitive symptoms. R. 571–72. The rheumatologist found that plaintiff "meets criteria" for fibromyalgia and diagnosed him with central pain hypersensitization/fibromyalgia, although he noted the prominent features of this condition were "without any current evidence on history, exam, or labs of underlying rheumatic etiology." R. 572–73. Plaintiff was prescribed thrice weekly, low-impact aerobic exercise, and physical therapy. R. 573. He was later referred for aquatic therapy, and was advised to consider taking gabapentin or NSAIDs along with various topical medications. R. 539–40. However, plaintiff was not thought to be a good candidate for

opioid treatment due to the unclear cause of his pain, and partly due to questions about possible misuse of the buprenorphine (butrans) previously prescribed. R. 556, 562.

Plaintiff received treatment at the facility's Veterans Integrative Pain Center, with an intake meeting in March 2021. R. 562, 577–79. Plaintiff's treatment plan there consisted of completing a musculoskeletal exam, music therapy, clinical hypnosis, medical acupuncture, chiropractic care, breath and movement training, cognitive behavior therapy, and a spirituality-based treatment option. R. 536. Treatment notes from this facility indicate plaintiff's mid-back pain had a "myofascial component though imaging shows syrinx, his description is myofascial and he did report botox helped in the past." R. 528.

### E.   Opinion Evidence[8]

#### 1.   State Agency Physician Review

##### a.   Abraham Oyewo, M.D.

On October 11, 2020, Dr. Oyewo, a state agency consultant, reviewed plaintiff's medical record. R. 75–76. Dr. Oyewo noted evidence of spondylosis, use of a TENS unit, and the presence of medically determinable impairments for degenerative disc disease, chronic fatigue syndrome, complex regional pain syndrome, spasm of the thoracic back muscle, carpel tunnel symptoms, gastroesophageal reflux disease ("GERD"), "Ha/Dyslipidemia," and hypertension/chest pain. Id. However, despite this evidence, he determined that the medical evidence of record was "insufficient . . . to assess this case." R. 76.

##### b.   Maureen Muoneke, M.D.

On December 31, 2020, Dr. Muoneke, at the reconsideration level, reviewed the medical

---

[8] Because plaintiff's appeal relates to the ALJ's treatment of the opinion of PA Rathnam relating to plaintiff's physical conditions, the Court omits the mental health-related opinions of Lindi Meadows, Ph.D., Robert Koontz, Ph.D., and Sabrina O'Kennon, Ph.D.

record, which she noted had no changes, new conditions, or limitations. R. 88–89. She agreed with Dr. Oyewo's assessment that she lacked sufficient evidence to assess plaintiff's case, and, given his date last insured of June 2020, opined that new medical records would "not be material evidence." R. 89.

### 2.    Corinne A. Rathnam, P.A.

On December 16, 2019, Corinne Rathnam, P.A., reviewed plaintiff's diagnoses, medical history, and examination results, and offered opinions on the functional impact, if any, of plaintiff's hypertension, R. 438–39, esophageal conditions, R. 439–40, shoulder and arm conditions, R. 441–49, back conditions, R. 449–58,[9] and peripheral nerve condition, R. 458–63, as part of a VA compensation and pension exam.

First, PA Rathnam opined that plaintiff's stable hypertension and stable esophageal conditions had no impact on his ability to work. R. 439–40.

Second, PA Rathnam opined that plaintiff's "right shoulder tendonitis may impact some physical work that requires lifting, pushing, or pulling objects greater than 15 lbs. It does not limit sedentary duties." R. 446. In doing so, PA Rathnam noted the onset dates for right and left shoulder pain of 2007 and 2018, respectively. R. 441. Testing revealed plaintiff's right shoulder had some loss in flexion and abduction, as well as some pain. R. 442. Testing of the left shoulder revealed a greater loss of flexion and abduction movement, as well as for external and internal rotation. *Id.* In both cases, PA Rathnam opined the loss of the range of motion and the pain noted

---

[9] In a March 2017 VA compensation and pension exam, Dr. Benjamin Zamora opined on plaintiff's lumbosacral strain and neck (cervical spine) conditions, including a thin thoracic syrinx that was present in an MRI of plaintiff's back. R. 476. He found none of these conditions limited plaintiff's ability to work. R. 480. The Court notes this record for completeness only, as plaintiff does not rely on this opinion, which predates the alleged date of onset by more than two years, and the ALJ only cites it to reference the aforementioned MRI. *See* R. 23–24, 28.

on exam did not result in loss of function. *Id.* Both shoulders showed full strength, were not instable, and were negative for issues on various tests, with the right shoulder being unremarkable on an imaging test. R. 443–46. However, a left shoulder MRI from 2018 had shown tendinosis, subacromial/subdeltoid bursitis, proximal bicipital tenosynovitis, and mild to moderate inflammatory arthropathy of the left acromioclavicular joint. R. 447.

Third, after conducting a physical examination and reviewing other evidence, PA Rathnam opined that plaintiff's chronic thoracolumbar spine (back) condition:

> prevents physical work. His back condition impacts his ability to perform duties that require prolonged walking or standing for greater than 10 minutes and pushing, pulling, or lifting objects greater than 15 lbs. from the knee to waist and waist to shoulder level.
>
> Veteran is able to perform at the sedentary demand level. He is capable of sitting for up to 10 minutes at a time prior to needing a standing rest break. He is capable of occasional standing and walking with rest breaks. He is capable of reaching at shoulder level and below.
>
> He is capable of work with significant accommodation or positioning and frequent rest breaks.

R. 449, 457. In reaching this conclusion, PA Rathnam noted plaintiff's existing lumbar strain and syrinx formation from the thoracic disability determinations, plaintiff's reports that prolonged walking or standing would cause persistent pain, and plaintiff's loss of some forward flexion and extension. R. 450. Plaintiff's examination was otherwise largely unremarkable, including no other unusual range of motion, no pain, weakness, fatigue, or incoordination that would "significantly limit functional ability with repeated use over a period of time," no "guarding or muscle spasm of the thoracolumbar spine," normal strength on all muscle tests, normal reflex exams, and normal sensory exams. R. 450–52. Although plaintiff was shown to have radiculopathy, it was noted as mild, with mild constant and intermittent pain in both lower extremities, with mild paresthesias and/or dysesthesia, but no numbness, and with no other signs of radiculopathy. R. 452. PA

19

Rathnam also noted two prior MRIs of plaintiff's thoracic spine. R. 453–57. The first was from February 2018 and showed only "[m]inimal caudal lumbar degenerative changes," with otherwise largely unremarkable or normal findings except for the presence of "mild bilateral facet arthrosis" on L4-L5 and a "minimal disc bulge" on L5-S1. R. 455–57. The second MRI was from October 2018 and, post fusion, showed "[n]o evidence of severe central canal stenosis," and, in most respects, showed normal results. R. 453–55.

Finally, after conducting a physical examination and reviewing other evidence related to plaintiff's chronic peripheral nerve condition, PA Rathnam opined that:

> Veteran's service connected bilateral lower extremity radiculopathy and upper left arm radiculopathy impacts some physical work that requires pushing, pulling, or lifting objects greater than 15 lbs and prolonged walking or standing. It does not prevent sedentary work. Veteran is able to perform sedentary work with accommodation and frequent breaks.

R. 463. PA Rathnam noted plaintiff's "persistent pain down both legs and pain radiating down the left arm," although she noted this constant and intermittent pain was mild, and that there was mild paresthesia in the left arm, and legs, with none in the right arm, and no numbness in any limb. R. 458–59. Plaintiff's other examination results were largely normal, including normal strength, normal range of motion, normal reflexes, normal sensation for light touch, no trophic changes, and normal gait. R. 459–61. Plaintiff's nerves were also normal, except for mild incomplete paralysis in both median and sciatic nerves, and moderate incomplete paralysis in the left upper radicular group. R. 461–62. While no "special tests" were performed for the median nerve evaluation, PA Rathnam noted, without comment, that 2018 EMG studies returned abnormal results for both upper extremities. R. 461, 463.

20

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[10] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a).  Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work in light of his RFC; and (5) had an impairment that prevents him from engaging in any substantial gainful employment.  R. 15–32.

The ALJ found that plaintiff met the insured requirements[11] of the Social Security Act through June 30, 2020, and had not engaged in substantial gainful activity from May 16, 2019, his amended, alleged onset date of disability.  R. 18.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) cervical spine degenerative disc disease status post fusion; (b) thoracic spine syrinx; (c) left and right shoulder degenerative joint disease; (d) bilateral carpal tunnel syndrome; (e) migraine headaches; (f) sleep apnea; (g) obesity; (h) major depressive disorder; (i) generalized anxiety disorder; and (j) PTSD.  *Id.*  The ALJ classified plaintiff's other impairments, including GERD,

---

[10] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[11] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

hypertension, hyperlipidemia, fibromyalgia, and renal stones as non-severe because "there is no medical evidence that these conditions resulted in significant (i.e., more than minimal) limitations, singly or in combination with other impairments, for at least twelve consecutive months . . . ." *Id.* The ALJ also found these conditions only cause "a slight abnormality that has no more than a minimal effect on the claimant's ability to perform basic work activities." *Id.* The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 18–22.

The ALJ next found that plaintiff possessed an RFC for less than a full range of sedentary work, *see* 20 C.F.R. § 404.1567(a), subject to the limitations that he:  (a) only occasionally push and/or pull up to 10 pounds; (b) stand/walk for no more than four of eight hours and sit up to six of eight hours with normal breaks; (c) no more than occasionally climb stairs or ramps but never climb ladders or scaffolds; (d) no more than occasionally stoop, kneel, crouch, and crawl; (e) no more than occasionally reach overhead or use foot controls; (f) do no more than frequent handling and fingering; (g) have no concentrated exposure to vibration or wetness; (h) do no work around unprotected heights or other hazards; (i) not be exposed to loud background noises; (j) only engage in simple, routine work; (k) only engage in "work involving simple, work related decisions with few, if any, workplace changes"; and (l) only occasionally have interactions with coworkers, supervisors, or the public.  R. 22–30.

In formulating the RFC, the ALJ considered PA Rathnam's opinion on plaintiff's physical limitations at step three and found it partially persuasive.  Specifically, the ALJ found:

> On December 20, 2019, Corinne A. Rathnam, PA, opined that the claimant's physical conditions impacts some physical work that requires pushing/pulling or

22

lifting objects greater than 15 pounds and prolonged walking or standing, but does not prevent sedentary work with accommodation and frequent breaks [R. 463].[12] The opinion is partially persuasive. Ms. Rathnam had the opportunity to examine the claimant, and her opinion regarding weight limitation and prolonged standing/walking is generally consistent with the claimant's diagnostic studies and generally normal physical examination findings of record, discussed above [R. 335, 375, 387, 401–02, 447, 457, 472, 557–59]. However, her opinion regarding "accommodation" and frequent breaks is somewhat vague, and inconsistent with the generally normal exam findings of record, which include full upper and lower extremity strength and normal gait. For these reasons, the opinion of Ms. Rathnam is partially persuasive.

R. 28.

At step four, the ALJ found that plaintiff could not resume his past relevant work as an emergency medical technician, paramedic, protective officer, government facility inspector, or technical instructor. R. 30. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs in the national economy, such as a sorter, table worker, and inspector. R. 30–31.

## IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws*

---

[12] For consistency's sake, the Court substitutes the ALJ's citations to the specific page numbers of individual exhibits with citations to the page numbers of the full record.

*v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

Plaintiff seeks a remand arguing that the ALJ failed to properly weigh the supportability and consistency of PA Rathnam's opinion, in violation of 20 C.F.R. § 404.1520c. Pl.'s Br. Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 14, at 5–11. Specifically, plaintiff argues the ALJ failed to conduct the necessary analysis by failing to discuss "what evidence was either consistent with or inconsistent with Ms. Rathnam's opinions," and by failing to address "Ms. Rathnam's own support for her findings," rather than dismissing them as vague and unsupported. *Id.* at 6–9 (citing 20 C.F.R. § 404.1520c(b)(2)). Plaintiff further contends that this omission means that the ALJ failed to "build an accurate and logical bridge from [that] evidence to his conclusion," and that this error was not harmless. *Id.* at 7–10.

24

The Commissioner argues that the ALJ adequately explained his reasons for finding the opinions of PA Rathnam partially persuasive. First, the Commissioner argues the ALJ appropriately considered supportability when he discussed PA Rathnam's findings earlier in his decision. Mem. Supp. Def.'s Mot. Summ. J. and in Opp. Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 17, at 17–18 (citing R. 24–25, 28). Second, the Commissioner argues that the ALJ appropriately considered consistency by citing to the imaging studies, *id.* at 19 (citing R. 24, 28), and that "the record offered no evidence that the ALJ could have found consistent with a need for frequent breaks or further accommodation, as suggested by Ms. Rathnam," *id.* at 20. Further, the Commissioner argues that the ALJ's description of PA Rathnam's opinions as "somewhat vague" was appropriate, and that any error from this statement did not prejudice plaintiff. *Id.* at 21–22.

In reply, plaintiff argues that a finding that an opinion is "'somewhat vague' does not address either" supportability or consistency. Pl.'s Reply Def.'s Mot. Summ. J. ("Pl.'s Reply"), ECF No. 18, at 2. He also reiterates that the ALJ "did not even cite to medical records to support his conclusion," and that the ALJ does not explain how the normal findings, like a normal gait, undermine PA Rathnam's opinion on accommodations or frequent breaks. *Id.* at 2–3.

**A.      *The SSA's methodology for considering medical opinions for claims filed after March 27, 2017, applies to this case.***

The SSA revised its evidence rules for claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, at 5853–55 (Jan 18, 2017); *see also* 82 Fed. Reg. 15132 (Mar. 27, 2017) (correcting technical errors in final rule). Plaintiff filed his applications for DIB in 2020, and the new rules apply to his case.

The revised regulations dispensed with the treating physician rule. *See* 20 C.F.R. § 404.1527(c)(2); *see also Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 255–56 (4th Cir. 2017). The SSA also rescinded Social Security Ruling ("SSR") 96-2p, which discussed how to

weigh treating source opinions. 82 Fed. Reg. 15263-01, at 15263 (Mar. 27, 2017). The new rules, contained in 20 C.F.R. § 404.1520c, direct the ALJ to "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). The ALJ must, however, still explain his consideration of the opinions in relation to the following factors: (1) supportability, or the relevance and strength of explanations for the opinion, (2) consistency, or the similarity with other opinions, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the relationship, and extent of the relationship, (4) specialization, relating to the training of the source, and (5) other factors, including but not limited to the source's familiarity with other medical evidence and the SSA's policies and requirements. 20 C.F.R. § 404.1520c(a), (c).

The rule also explains how an ALJ should go about articulating determinations and decisions regarding the persuasiveness of opinions. 20 C.F.R. § 404.1520c(b). The rule clarifies that evidence should be handled on a provider-by-provider basis, not an opinion-by-opinion basis, negating the need for individual treatment of every medical opinion in the record. 20 C.F.R. § 404.1520c(b)(1). Further, the ALJ is only required to articulate the supportability and consistency factors when discussing an opinion and need only address the other factors when relevant and at his discretion. 20 C.F.R. § 404.1520c(b)(2).[13]

An ALJ who determines that an opinion is unpersuasive must still point to substantial evidence supporting the decision, and the Fourth Circuit has stated that the ALJ "has the obligation

---

[13] In the event, not applicable here, that the ALJ finds that two opinions on the same issue are equally well-supported and consistent with the rest of the record, but do not share an identical finding, he should resort to and discuss the remaining factors to differentiate them. 20 C.F.R. § 404.1520c(b)(3).

to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). The ALJ is also obliged by Social Security Ruling 96-8p to "include a narrative discussion describing how the evidence supports each conclusion." *Monroe v. Colvin*, 826 F.3d 176, 190 (4th Cir. 2016) (quoting *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)). Remand may be appropriate when a court must guess how the ALJ arrived at the conclusions and meaningful review is frustrated. *Mascio*, 780 F.3d at 636–37. However, the ALJ need not repeat pertinent findings multiple times throughout a ruling for the purpose of supporting individual conclusions. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (noting "that the ALJ need only review medical evidence once in his decision"); *Kiernan v. Astrue*, No. 3:12cv459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (observing that, where an "ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion" in other parts of the analysis).

**B.   *The ALJ committed no error in evaluating PA Rathnam's medical opinions.***

Plaintiff offers two main arguments on consistency and supportability. On consistency, plaintiff argues that the ALJ did not discuss "what evidence was either consistent with or inconsistent with Ms. Rathnam's opinions. . . . To suggest otherwise is problematic because there is no manner in which a subsequent reviewer could infer or identify the evidence the ALJ meant to use here because the ALJ did not cite any." Pl.'s Mem. 7. And on supportability, plaintiff similarly argues that "the ALJ did not discuss any of the 'medical evidence or supporting explanations' supporting [PA Rathnam's] opinions as is required." *Id.* at 9 (quoting 20 C.F.R. § 404.1520c(c)(1)).

27

However, the ALJ discussed the medical evidence within and outside PA Rathnam's opinions. While plaintiff argues that "[t]he ALJ's blanket statement that the record contains 'generally normal exam findings' does not address either" supportability or consistency, Pl.'s Reply at 3, the Court disagrees. Instead, this and other statements in the ALJ's decision show the ALJ considered the supportability and consistency of PA Rathnam's opinions. R. 28. Further, the ALJ provided a sufficient explanation for his decision, and, therefore, his decision otherwise complies with 20 C.F.R. § 404.1520c, and is supported by substantial evidence.

### i.   The ALJ's analysis of PA Rathnam's opinions relied on the normal findings in the record, in addition to finding certain of her opinions "somewhat vague."

Before going further, it is important to contextualize what the ALJ found as to PA Rathnam's opinions, as this is not a case where the ALJ found them all unpersuasive. *Id.* To start, both the ALJ and PA Rathnam agreed that plaintiff could perform some range of sedentary work. R. 22–23, 457, 463; *see also* 20 C.F.R. § 404.1567(a) (defining sedentary work as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles" and involves sitting most of the time, with no more than occasional walking and standing).

Moreover, the ALJ found PA Rathnam's opinions partially persuasive and incorporated several of her proposed limitations into the RFC. R. 22–23, 26, 28. For example, PA Rathnam opined that plaintiff's conditions impact his ability to do physical work requiring "pushing, pulling, or lifting objects greater than 15 lbs and prolonged walking or standing [but] [i]t does not prevent sedentary work." R. 463. The ALJ found this portion of PA Rathnam's opinions persuasive, noting that it was "generally consistent with the claimant's diagnostic studies and generally normal physical examination findings of record, discussed above." R. 28 (citing R. 335, 375, 387, 401–02, 447, 457, 472, 557–59). The ALJ, therefore, incorporated the sedentary work limitation into the RFC, with a further limit on pushing or pulling up to 10 pounds only occasionally, and a

cumulative limit of standing or walking up to four of eight hours with normal breaks. R. 22–23, 26.

The ALJ did not incorporate limitations around accommodations or frequent rest breaks, finding that PA Rathnam's "opinion regarding 'accommodation' and frequent breaks is somewhat vague,[14] and inconsistent with the generally normal exam findings of record, which include full upper and lower extremity strength and normal gait." R. 28. The ALJ identified what normal findings and studies he meant by including accurate references to normal findings from both within and outside of PA Rathnam's opinions throughout his decision. These references, along with other statements in the ALJ's decision, coupled with the ALJ's adequate articulation of his reasoning, show the ALJ properly considered supportability and consistency.

ii.    **The ALJ considered PA Rathnam's opinions for supportability.**

Addressing supportability first, the ALJ explicitly cites several pages from the record as to the findings and diagnostic imaging he found partially supported, and partially detracted from, PA Rathnam's opinions, including pages from within her opinions. R. 28 (citing 447, 457). Those pages reference imaging studies that PA Rathnam relied on in forming her opinions, including: (1) a CT angiography, which indicates clear lungs, with no pleural effusion or pneumothorax, a normal heart size with unremarkable aorta or great vessels, and no abnormal artery findings, and "[t]he visualized upper abdomen demonstrates no significant abnormality" with no lesions noted, R. 447; (2) an MRI of the left shoulder that showed "mild tendinosis," a "[l]ow-grade partial interstitial tear," "mild subchondral cyst formation," [m]ild increased fluid signal within tendon sheath,"

---

[14] Plaintiff's argument that the ALJ improperly noted that PA Rathnam's opinions were "somewhat vague," Pl.'s Mem. 6, 8–9, is not persuasive. As discussed elsewhere, the ALJ articulated how he considered supportability and consistency, as is required by 20 C.F.R. § 1520c(a). Further, 20 C.F.R. § 404.1520c(c)(5) permits the ALJ to consider "other factors that tend to support or contradict a medical opinion." Logically, this includes the clarity of a medical opinion, since an ALJ cannot be fully persuaded by an opinion lacking necessary detail.

"[p]roximal bicipital tenosynovitis, without disruption or subluxation," and "[m]ild to moderate inflammatory arthropathy at the left a.c. joint including mild capsular and periarticular inflammation," *id;* and (3) a lumbar spine MRI showing normal findings except for signs of "mild bilateral facet arthrosis" on L4-L5 and "[a] minimal disc bulge" on L5-S1, R. 456–57.

Additionally, when addressing PA Rathnam's opinions, the ALJ notes that the records of the normal findings were "discussed above." R. 28. The ALJ previously discussed PA Rathnam's exam findings noting the

> generally normal findings, including no evidence of shoulder tenderness or pain with weight-bearing bilaterally, full bilateral shoulder strength with no muscle atrophy, negative Hawkin's impingement test bilaterally, full bilateral lower extremity strength without muscle atrophy, intact knee and ankle reflexes bilaterally, normal lower extremity sensory bilaterally, full bilateral elbow and wrist strength, full bilateral grip strength, intact bilateral upper extremity reflexes, normal bilateral lower extremity sensory, and normal gait.

R. 25 (citing R. 441–45, 448, 450–52, 459–61).

Further, these normal findings, a characterization plaintiff does not dispute, arguably conflict with plaintiff's reported symptoms to PA Rathnam. For example, although he "exhibit[ed] modest reduction in back and bilateral shoulder range of motion," plaintiff reported "persistent bilateral shoulder pain, back pain with walking, standing and going up and down stairs, mild bilateral lower extremity paraesthesias, and poor sleep," which the ALJ repeatedly said he thought were not fully supported by the record. R. 23–26 (citing R. 441–45, 448, 451–53). Thus, the ALJ noted adequate grounds from PA Rathnam's opinions to find they were less than fully supported by her own exam findings.

### iii.   The ALJ considered the consistency of PA Rathnam's opinions with the medical and other evidence.

Addressing consistency second, the ALJ's discussion of PA Rathnam's opinions explicitly cites evidence from other parts of the record, R. 28 (citing R. 335, 375, 387, 401–02, 557–59).

Those pages show studies, including: (1) an EMG report finding median nerve compression at the wrists, R. 335; (2) chest x-ray showing a normal heart size and configuration with clear lungs with "[n]o focal infiltrate or pleural effusion," intact bony structures, and "[m]inimal mid thoracic degenerative disc disease, R. 375; (3) a right shoulder MRI showing "mild rotator cuff tendinosis without tear" and "[m]inimal degenerative changes at the greater and lesser tuberosities and the acromioclavicular joint," R. 387; (4) a cervical MRI showing mostly normal discs in the cervical spine, with "C4-5 disc osteophyte protrusion with mild canal stenosis" and "[n]o signal changes within the cord," R. 401–02; and (5) another cervical MRI showing "no significant canal or foraminal narrowing" in most parts of the cervical spine, with only "[v]ery slight increase in endplate marrow edema signal . . . likely mild Modic-type endplate degenerative change or developing Schmorl's node" along with "[v]ery small new or increased left foraminal-paracentral disc-osteophyte protrusion at C6-C7 with mild left foraminal narrowing," with very similar results in the thoracic spine, R. 557–59. Thus, as these studies mostly show mild or no significant findings, the ALJ reasonably described them as "generally normal" findings. R. 28.

Additionally, the ALJ's opinion contains other references to normal findings, independent of PA Rathnam's opinions. For example, the ALJ notes an apparent conflict between plaintiff's reports of pain and the normal findings of plaintiff's lungs, heart rate and rhythm, and intact cranial nerves. R. 25 (citing R. 726, 788, 793). Other records referenced in the ALJ's opinion also indicate that plaintiff had a "full bilateral upper extremity strength, nonantalgic gait, normal muscle bulk and tone, normal range of motion in all extremities, intact sensory to light touch, and normal respiratory effort." *Id.* (citing R. 599, 602–03). Another record referenced by the ALJ noted plaintiff had "no upper or extremity tenderness or swelling bilaterally, good bilateral upper

extremity grip, full bilateral upper extremity range of motion, full bilateral knee and ankle range of motion, and preserved balance." *Id.* (citing R. 571).

The Court also has to consider the ALJ's treatment of PA Rathnam's opinions in context with the other findings the ALJ made relative to these normal exam findings. *See* 20 C.F.R. § 1520c(c)(2) (allowing an ALJ to consider "evidence from other medical sources and nonmedical sources" when examining an opinion's consistency). For example, the ALJ found that the record did not show plaintiff met the listing requirements for "[d]isorders of the skeletal spine resulting in compromise of a nerve root(s)," R. 19, "[l]umbar spinal stenosis resulting in compromise of the cauda equina," *id.*, "[a]bnormality of a major joint(s) in any extremity," R. 20, or "[p]eripheral [n]europathy," *id* (noting plaintiff "does not have disorganization of motor function in <u>two</u> extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station"). Further, the ALJ, in determining that the record did not fully support plaintiff's alleged severity of symptoms, *see* R. 23–26, noted that plaintiff's physical therapy records indicate that, despite complains of constant pain in his neck, shoulder, and thoracic back region, he was able to do many chores without issue, R. 25 (citing R. 305, 307). The ALJ also observed that plaintiff "finished graduate school to become a mental health counselor, despite reporting crippling anxiety, struggles with past trauma, and constant intense physical pain." R. 25 (citing R. 294); *see also* R. 21 (citing R. 327–28); R. 22 (citing R. 216) (noting plaintiff's ability to drive and handle a savings account).

These conclusions, and the findings upon which they rest, provide added context for the ALJ's conclusion that PA Rathnam's opinions were not fully supported by, and consistent with, the alleged severity of plaintiff's limitations. R. 23–24, 26.

32

iv.    **The ALJ sufficiently explained why PA Rathnam's opinions are partially persuasive.**

The ALJ's reference to "generally normal exam findings of record," R. 28, thus refers to many undisputedly normal findings from both PA Rathnam's opinions and from elsewhere in the record, as required for a supportability and consistency analysis. Although plaintiff argues that "the ALJ did not cite to any" evidence to explain what he meant by "generally normal exam findings of record," Pl.'s Mem. 7, this argument is unavailing given both the explicit citations in the ALJ's discussion of PA Rathnam's opinions, as well as the reference to "mostly normal findings" incorporating references to other records the ALJ already discussed. Notwithstanding plaintiff's arguments, the ALJ was under no obligation to further cite or restate unambiguous references to the "normal" or "generally normal" findings already discussed and incorporated by reference. R. 25, 28; *see also McCartney*, 28 F. App'x at 279 (finding the ALJ "need only review medical evidence once in his decision").

As for any argument that the ALJ needed to provide more detailed reasoning, an ALJ needs to only articulate his consideration such that it is sufficient to "allow a . . . reviewing court to trace the path of an [ALJ's] reasoning," and determine whether it is supported by substantial evidence. *See* 82 Fed. Reg. 5844-01, at 5858. Here, it is clear the ALJ concluded that the "generally normal exam findings of record" supported some of PA Rathnam's conclusions, while also undermining her opinions that plaintiff needed any further accommodations or breaks beyond the "normal breaks" and other limitations included in the RFC. R. 22–23, 28. To the extent that plaintiff disagrees with this conclusion and argues that "normal strength and gait have little to do with the actual opinions," Pl.'s Mem. 8, it is the ALJ's job to weigh the conflicting evidence and determine what impact that has on plaintiff's RFC, *Craig*, 76 F.3d at 589.

33

The Court's task is to ensure the ALJ applied the proper legal standard and that his opinion is supported by substantial evidence, *see Johnson*, 434 F.3d at 653. Here, the record shows that the ALJ's conclusion that the "mostly normal findings" did not support some of PA Rathnam's opinions is supported by substantial evidence. As for the ALJ providing further reasoning for rejecting specific portions of PA Rathnam's opinions, an ALJ is only required to consider consistency and supportability on a provider-by-provider basis, and not for every single opinion a provider offers. 20 C.F.R. § 404.1520c(b)(1). Importantly, despite plaintiff arguing that the ALJ "does not address Ms. Rathnam's support for her own findings in any way," plaintiff does not identify any specific evidence or supporting explanation that the ALJ allegedly missed or argue that the ALJ cherry-picked or mischaracterized the record in his analysis of her opinions as a whole. Pl.'s Mem. 8. At most, plaintiff lists PA Rathnam's identified limitations that the ALJ did not adopt, Pl.'s Mem. 8–9, but, as discussed, the ALJ adequately addressed those limitations by explaining that they were not supported or consistent with the underlying factual findings. R. 28.

Thus, the ALJ articulated sufficient analysis to trace his reasoning about PA Rathnam's opinions, as required by 20 C.F.R. § 404.1520c, and the Court finds that his decision is supported by substantial evidence.

## VI.   RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED**.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

34

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert L. Krask
United States Magistrate Judge
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August 25, 2022